

ORIGINAL

1   BROWN WHITE & NEWHOUSE LLP
    KENNETH P. WHITE (Bar No. 173993)
2   kwhite@brownwhitelaw.com
    NANNINA L. ANGIONI (Bar No. 238052)
3   nangioni@brownwhitelaw.com
    333 South Hope Street, 40th Floor
4   Los Angeles, California 90071-1406
    Telephone: 213. 613.0500
5   Facsimile: 213.613.0550
6
    Attorneys for Relator,
7   Alex Timple
8
9               UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11  UNITED STATES OF AMERICA          Case No.:
    ex rel. ALEX TIMPLE,              CV14-3613 DDP-VBK
12
13                                    COMPLAINT
            Plaintiffs,
14                                    FILED IN CAMERA AND UNDER
        v.                            SEAL PURSUANT TO 31 U.S.C. §
15                                    3730(b)
    EXCEL CARE HOME HEALTH
16  SERVICES, INC., a California corporation,
    INSIGHT HEALTH CARE PROVIDERS,
17  INC., a California corporation, LEMAR
    HOME HEALTH SERVICES, INC., a
18  California corporation, RIGHTCARE
    HOME HEALTH SERVICES, INC., a
19  California corporation, SERENITY
    HEALTH CARE, INC., a California
20  corporation, UNIK HOME HEALTH
    CARE SERVICES, INC., a California
21  corporation, and DOES 1 through 20,
    inclusive,
22
            Defendants.
23
24
25
26
27
28

FILED
2014 MAY -9 PM 4:07
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

PAID
MAY 9 2014
Clerk, US District Court
COURT 4612

1106259.1

1   Plaintiffs the United States of America by and through *qui tam* relator, Alex
2   Timple ("Mr. Timple"), bring this action under 31 U.S.C. §§ 3729-3732 (the "False
3   Claims Act") to recover all damages, penalties and other remedies established by the
4   False Claims Act on behalf of the United States and Mr. Timple.

5   **I.     PARTIES**

6   1.      Relator Alex Timple is a citizen of the United States and a resident of the
7   State of California.

8   2.      Defendant Excel Care Home Health Services, Inc. ("Excel") is a
9   corporation incorporated in the State of California, and which does business in the
10  Central District of California.  Excel owns and operates a Medicare-certified home
11  health care agency and hospice.  Excel may be served through its registered agent Dove
12  Gabrielle Manuel De Jesus at 222 North Mountain Avenue, Suite 104, Upland,
13  California 91786.

14  3.      Defendant Insight Health Care Providers, Inc. ("Insight") is a corporation
15  incorporated in the State of California, and which does business in the Central District of
16  California.  Insight owns and operates a Medicare-certified home health care agency and
17  hospice.  Insight may be served through its registered agent Roderick Aquino at 500 S.
18  Kraemer Blvd., Suite 240, Brea, California 92821.

19  4.      Defendant Lemar Home Health Services, Inc. ("Lemar") is a corporation
20  incorporated in the State of California, and which does business in the Central District of
21  California.  Lemar owns and operates a Medicare-certified home health care agency and
22  hospice.  Lemar may be served through its registered agent Luis A. Tungol at 750
23  Terrado Plaza, Suite 31, Covina, California 91723.

24  5.      Defendant Rightcare Home Health Services, Inc. ("Rightcare") is a
25  corporation incorporated in the State of California, and which does business in the
26  Central District of California.  Rightcare owns and operates a Medicare-certified home
27  health care agency and hospice.  Rightcare may be served through its registered agent
28  Eusebio Sonny Agonias at 28684 Cloverleaf Place, Castaic, California 91384.

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

6.   Defendant Serenity Health Care, Inc. ("Serenity") is a corporation incorporated in the State of California, and which does business in the Central District of California.  Serenity owns and operates a Medicare-certified home health care agency and hospice.  Serenity may be served through its registered agent Helen Martin, 1149 S. Grand Avenue, Glendora, California 91740.

7.   Defendant Unik Home Health Care Services, Inc. ("Unik") is a corporation incorporated in the State of California, and which does business in the Central District of California.  Unik owns and operates a Medicare-certified home health care agency and hospice.  Unik may be served through its registered agent Tigran Oganesyan at 14114 Victory Blvd., Suite 202, Sherman Oaks, California 91401.

8.   The true names, identities, and capacities, whether individual, corporate, associate, or otherwise of defendants DOES 1 through 20, inclusive, are unknown to Mr. Timple who consequently sues said defendants by such fictitious names.  Mr. Timple will ask leave of the Court to amend this Complaint to show the true names and capacities of such defendants, identified herein as DOE, when the same are ascertained.

## II.   JURISDICTION AND VENUE

9.   Jurisdiction and venue are proper in this Court for the following reasons:

a.   Jurisdiction for this Court exists pursuant to the False Claims Act (31 U.S.C. § 3730(b)(1) and 31 U.S.C. § 3732(a)) because Relator Mr. Timple's claims seek remedies on behalf of the United States for Excel's, Insight's, Lemar's, Rightcare's, Serenity's, and Unik's (collectively "Defendants'") multiple violations of 31 U.S.C. § 3729, some of which occurred in the Central District of California, and because Defendants transact other business within the Central District of California.

b.   Venue exists in the United States District Court for the Central District of California pursuant to 31 U.S.C. § 3730(b)(1) and 31 U.S.C. § 3732(a) because Defendants are qualified to do business in the State of California and within the Central District, and Defendant transacts business or committed acts

1106259.1

1    proscribed by § 3729, in the State of California and the Central District of

2    California, including the specific conduct described in this Complaint.

### III.   INTRODUCTION

4    10.    This suit concerns fraud by several Medical-certified home health agencies:

5    Excel, Insight, Lemar, RightCare, Serenity, and Unik (collectively "Defendants").

6    Defendants' fraudulent conduct involves (1) paying kickbacks to top-referring

7    physicians and marketers, (2) submitting fraudulent claims to Medicare, (3) submitting

8    false records to obtain Medicare payments, and (4) forging physician signatures on

9    orders needed to support Medicare claims.

10   11.    Mr. Timple has personal knowledge of Defendants' illegal conduct.  Mr.

11   Timple worked for Emerald Management Resources, Inc. ("Emerald") in a clerical

12   capacity starting in January 2008.  Emerald provided serviced including accounting,

13   billing, and information management systems to home health agencies ("HHAs").  Mr.

14   Timple worked for Emerald as a billing and account manager for Emerald's HHA

15   clients, both at Emerald's offices in Moreno Valley, California and Glendora, California

16   and on-site at clients' offices.  His duties included billing, accounting, accounts

17   receivable, accounts payable, filing, and payroll.  Approximately four months after

18   starting with Emerald, Mr. Timple's supervisor instructed him to visit Defendants at

19   their places of business to complete his work.  After more than one month of working at

20   Defendants' offices, Mr. Timple began to suspect that Defendants were engaging in

21   illegal conduct.  Thus, Mr. Timple did discover any fraud, nor could he have suspected

22   any wrongful conduct on Defendants' part until after June 2008.  Based on Mr. Timple's

23   observations he estimates that Defendants submitted approximately $2,669,726 in

24   fraudulent claims to Medicare.  Mr. Timple also estimates based on his observations that

25   during the same time period, Defendants paid more than $250,000 in unlawful kickbacks

26   to physicians and marketers.

27   //

28

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

# IV.   STATUTORY AND REGULATORY BACKGROUND

## A.   Medicare Part A

12.     Medicare is a government health insurance program that provides coverage to people who are aged 65 and over, or who meet other special criteria.  The Medicare program was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. §§1395-1395gg).  Medicare is administered by the Centers for Medicare & Medicaid Services (CMS or HHS-CMS), which is a component of the United States Department of Health and Human Services (HHS).  Prior to July 1, 2001, CMS was known as the Health Care Financing Administration (HCFA).  Medicare covers certain medical services and supplies in hospitals, doctor's offices, and other health care settings.  Services are either covered under Medicare Part A (Hospital Insurance) or Medicare Part B (Medical Insurance).

13.     Medicare Part A provides basic protection against the costs of the following: (1) inpatient hospital care (including critical access hospitals and inpatient rehabilitation facilities); (2) inpatient stays in a skilled nursing facility (not custodial or long-term care); (3) hospice care services; (4) home health care services; and (5) inpatient care in a Religious Nonmedical Health Care Institution (facility that provides non-medical, non-religious health care items and services to people who need hospital or skilled nursing facility care but for whom that care would not be in agreement with their religious beliefs).  (See 42. U.S.C. § 1395 c.)  A hospital that elects to participate in the Medicare Part A program is known as a "provider."  (42 C.F.S. § 400.202.)

## B.   Home Health Agencies

### i. Introduction

14.     As of 2005, there are approximately 8,000 active Medicare-certified home health agencies (HHAs), which enable Medicare beneficiaries and others to receive skilled nursing, rehabilitation therapy, aide services, or medical social services in their homes.  HHAs are institutions that meet the requirements of Section 1861(o) of the Social Security Act.

BROWN, WHITE & NEWHOUSE
ATTORNEYS

15.   Medicare home health benefits covered under Part A include (1) part-time or intermittent nursing care provided directly by or under the supervision of a registered nurse; (2) physical, occupational, and speech therapy; (3) medical social services if related to the patient's health problems; and (4) part-time or intermittent home health aide services when provided as an adjunct to skilled nursing or therapy care.  Part A does not provide coverage for long-term or custodial care.   Care within the provisions of Part A must be ordered by a doctor and provided by a Medicare-certified HHA.  The patient must be homebound; meaning that leaving home takes a significant amount of effort.  Part A covers the cost of the first 100 home health visits following a hospital stay.

16.   To be eligible for Medicare's home health benefit, beneficiaries must have a physician order for home care, must demonstrate a need for part-time (fewer than eight hours per day) or intermittent (not daily) skilled care to treat their illness or injury, and must be unable to leave their homes without considerable effort.  If these conditions are met, Medicare will pay for all covered home health services for as long as the patient is eligible and his/her doctors confirm that the services are needed.  However, the skilled nursing care and home health aid services are only covered on a part-time or "intermittent" basis.  Although Medicare is a substantial payer of home health services, most Medicare-certified agencies also serve patients whose care is paid for either by Medicaid, private fee-for-service insurers and HMOs, or directly by patients as an out-of-pocket expense.

17.   Generally, once a doctor refers a patient to an HHA, staff members from the HHA go to the patient's home to discuss the patient's needs and health condition.  HHA staff members will also speak with the referring doctor about the patient's care.  An HHA is required to obtain an order from the patient's doctor before it can begin providing services to the patient.

18.   HHAs work with a patient and his/her doctor to develop a "plan of care."  A plan of care identifies the services and care the patient is to receive and also includes the

1106259.1

1 health care professionals who are to render the services, the frequency with which the
2 patient needs services, the required medical equipment, and the results the doctor
3 expects the patient will experience. Doctors and HHA staff members must review the
4 patient's plan of care as often as necessary and, in any event, at least once every 60 days.
5 If the patient's health conditions change, the HHA staff must immediately notify the
6 patient's doctor and obtain the doctor's approval before making any changes to a
7 patient's plan of care. HHAs are also obligated to inform the patient of any changes in
8 his/her plan of care.

9      19.    With respect to payments, CMS contracts with eight regional home health
10 intermediaries, also known as fiscal intermediaries, to process home health claims, set
11 reimbursement rates, make payments, educate providers, audit cost reports, and maintain
12 payment safeguards. Fiscal intermediaries are essentially private insurance companies
13 that act as agents for the federal government in processing and paying Medicare claims.

14     *ii. Medicare Certification*

15     20.    In order for an HHA to become Medicare-certified, it must meet the
16 requirements set forth in sections 1861(m) and 1891(a) of the Social Security Act, as
17 well as CMS's Conditions of Participation (COP or COPs), which are outlined in 42
18 CFR §§ 484 and 488. The COPs are intended to ensure that, among other things, HHAs
19 are appropriately staffed, following doctor-approved plans of care, maintaining the
20 appropriate medical records to document all care provided, and periodically reassessing
21 each patient's condition. The CMS administers the Medicare program and contracts
22 with state licensing and certification agencies that determine whether providers meet and
23 continue to meet the COPs. Once Medicare-certified, HHAs may furnish home health
24 services using its own staff and independent contractors.

25     21.    Medicare-certified HHAs are either proprietary (private, for-profit),
26 voluntary (private, nonprofit), or Government-owned and operated. Reimbursement for
27 services provided is based on the costs (subject to geographically-based cost limits)
28 incurred in providing covered visits to eligible beneficiaries. The COPs apply to an

1106259.1

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

1   HHA as an entity and to the services it provides to all individuals under its care,

2   regardless of the source of payment.  Medicare does not limit the number of visits or the

3   length of time a patient can receive home health care services; services are covered for

4   as long as reasonably necessary to treat the patient's illness or injury.  As a Part A

5   benefit, there are no beneficiary copayments or deductibles for home care.

6   ### iii.  Outcome and Assessment Information Set ("OASIS")

7   22.    In 1999, CMS mandated that Medicare-certified HHAs develop a patient-

8   specific, comprehensive assessment that identifies each patient's home care needs and

9   meets the patient's medical, nursing, rehabilitative, social and discharge planning needs.

10   As part of the comprehensive assessment, HHAs must use a standard core assessment

11   data set, also known as the "Outcome and Assessment Information Set" (OASIS), when

12   evaluating adult, non-maternity patients.  (See 42 CFR § 484.20.)  HHAs must collect

13   and encode OASIS data at specific points in time (at the times of admission, transfer,

14   resumption of care after an inpatient stay, recertification every 60 days that the patient

15   remains in care, significant changes of a patient's condition, and discharge) for all adult

16   non-maternity patients receiving skilled services, and transmit the data to the requisite

17   State agency or HCFA OASIS contractor.  (See 42 CFR §484.20.)

18   ### iv.  Annual Cost Reports

19   23.    Medicare reimburses providers for costs that are: (1) for a Medicare-

20   covered service; (2) related to patient care; and (3) reasonable.  (42 U.S.C. § 1396f (b);

21   42 C.F.R. § 413.9.)  Section 1395x(v)(1)(A) defines "reasonable costs" as being "the

22   cost actually incurred, excluding … any part … found to be unnecessary in the efficient

23   delivery of needed health services …."  In accordance with sections 1815(a), 1833(e),

24   and section 1861(v)(1)(A)(ii) of the Social Security Act (42 U.S.C. 1395g) and 42 CFR

25   413.20(b), Medicare providers must submit annual cost reports to private insurance

26   companies called "fiscal intermediaries" to settle its costs for providing health care

27   services to Medicare beneficiaries.  A cost report is a provider's accounting of its total

28   costs for the year, based on definitions, accounting, statistics, and reporting practices that

BROWN, WHITE & NEWHOUSE[LP]
ATTORNEYS

1    are standard in the hospital and related industries.

2          24.    Fiscal intermediaries pay providers using funds from the Federal Hospital

3    Insurance Trust Fund.  (See 42 U.S.C. 1395i.)  Fiscal intermediaries give periodic

4    interim payments to providers by estimating treatment costs.  (*See*, 42 U.S.C. §

5    1395g(e).)  At the end of the year, fiscal intermediaries use the providers' cost reports to

6    determine whether Medicare overpaid or underpaid the provider and will then either

7    request reimbursement or provide a rebate.  (42 U.S.C. §1395g(a); 42 CFR

8    §413.9(b)(1).)

9          25.    Under section 1320a-7b(a) of the Social Security Act and section 455.2 of

10   the Code of Federal Regulations, it is a felony for a provider to intentionally make false

11   statements of material facts in seeking to obtain any payment from Medicare.  As set

12   forth hereinabove, Mr. Timple has personal knowledge that from the year 2008 to 2010,

13   Defendants submitted false cost reports to Medicare.  Overall, Mr. Timple estimates

14   based on his observations that Defendants submitted approximately $2,669,726 in false

15   costs to Medicare for reimbursement.  Additionally, Mr. Timple has personal knowledge

16   that Defendants' staff forged physician's signatures on at least 100 claims submitted to

17   Medicare.

18   **C.    Anti-Kickback Statute**

19          26.    The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the

20   Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-

21   7b(b), make it illegal for an individual to knowingly and willfully offer or pay

22   remuneration in cash or in kind to induce a physician to order a good or service that is

23   reimbursed by a federal healthcare program.  (*See*, 42 U.S.C. § 1320a-7b(b)(2).  *See also*

24   Cal. Welf. & Inst. Code § 14107.2(b).)  "Remuneration" is broadly defined to include

25   anything of value offered or paid in return for purchasing, ordering, or recommending

26   the purchase or order of any item reimbursable by a federal healthcare program.

27          27.    The purpose of the Anti-Kickback Statute is to prohibit such activities in

28   order to secure proper medical treatment and patient referrals.  The Statute also serves to

1106259.1

Brown, White & Newhouse™
ATTORNEYS

1    limit the prescription of unnecessary treatments, services, or goods that are based, not on

2    the needs of the patient, but on improper incentives.  The Statute endeavors to promote a

3    patient's right to choose proper medical care and services. Paying kickbacks ultimately

4    inherently interferes with the doctor-patient relationship and creates a conflict of interest

5    that potentially puts the patient's health at risk.

6        28.    Any defendant convicted under the Anti-Kickback Statute is automatically

7    barred from participating in federal and federally-funded healthcare programs, such as

8    Medicare, Medicaid or ADAP.

9        29.    Kickbacks can take any of the following forms:

10           (1)    Payment of a fee to a physician for each plan of care the physician

11                  certifies for the home health agency;

12           (2)    Payment of referral fees, disguised as salaries, to referring physicians

13                  for services that were not rendered or in an amount that exceeds the

14                  fair market value of services rendered;

15           (3)    Offering free services to patients, including transportation and meals,

16                  if they agree to change home health providers;

17           (4)    Providing hospitals with discharge planners, home care coordinators,

18                  or home care liaisons in order to induce referrals;

19           (5)    Providing free services, such as 24 hour nursing coverage, to

20                  retirement homes or adult congregate living facilities in return for

21                  home health referrals; and

22           (6)    Subcontracting with retirement homes or adult congregate living

23                  facilities for the provision of home health services, to induce the

24                  facility to make referrals to the agency.

25       30.    As set forth hereinabove, Mr. Timple has personal knowledge that from the

26   year 2008 to 2010, Defendants gave illegal kickbacks, in a variety of forms, to its top-

27   referring physicians.  These kickbacks were given to referring physicians and marketers

28   in violation of the Anti-Kickback Statute.  Mr. Timple estimates based on his

10

QUI TAM COMPLAINT

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

1 | observations that approximately $250,000 in money, goods, and services was given to
2 | Defendants' referring physicians and marketers.

3 | **D.    Federal False Claims Act**

4 | 31.    This is an action to recover damages and civil penalties on behalf of the
5 | United States and Relator Mr. Timple arising from Defendants' false or fraudulent
6 | statements, claims, and acts made in violation of the False Claims Act, 31 U.S.C. §§
7 | 3729-3732.

8 | 32.    The False Claims Act ("FCA") provides that any person who knowingly
9 | submits or causes to be submitted to the United States for payment or approval a false or
10 | fraudulent claim, is liable to the Government for a civil penalty of not less than $5,500
11 | and not more than $11,000 for each such claim, plus three times the amount of damages
12 | sustained by the Government because of the false or fraudulent claim.

13 | 33.    The False Claims Act allows any persons having knowledge of a false or
14 | fraudulent claim made to the Government to bring an action in Federal District Court on
15 | his/her own behalf and on behalf of the United States Government and to share in any
16 | recovery as authorized by 31 U.S.C. § 3730.

17 | 34.    Based on these provisions, Mr. Timple, on behalf of the United States
18 | Government, seeks to recover damages and civil penalties, through this action, arising
19 | from Defendants' submission of false claims for payment or approval.  In this case,
20 | Defendants' false claims were submitted to the federal Government so that they could
21 | collect reimbursement payments from Medicare.  Mr. Timple believes the United States
22 | has suffered significant damages, estimated at approximately $2,669,726, as a result of
23 | Defendants' false claims.

24 | 35.    As required under the False Claims Act, Mr. Timple has provided the
25 | Attorney General of the United States and the United States Attorney for the Central
26 | District of California with a statement of all material evidence and information related to
27 | this Complaint.  Mr. Timple's pre-filing disclosure statement was supported by
28 | documentary evidence.

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

1106259.1

# V.   FACTUAL BACKGROUND

## A.   Overview of Home Health Agencies and Medicare Fraud

36.   Home health agencies provide home health aides, nursing services, occupational therapy, physical therapy, social workers, and speech therapists to patients who are unable to leave their homes without significant difficulty.  Medicare provides coverage for these services provided that the home health agency complies with certain requirements.  Medicare does not limit the number of patient visits or length of period of care that it will cover as long as the healthcare services are reasonable and necessary to treat the patient's injury or illness.  Patients are not responsible for copayments or deductibles for home care visits.

37.   Home health agencies are particularly vulnerable to abuse and fraud for several reasons.  First, Medicare covers an unlimited number of patient home health care visits.  Also, there is limited medical supervision of home health services provided by non-medical personnel.  These factors have led to a variety of fraudulent schemes including home health agencies giving kickbacks in exchange for Medicare referrals and providing false information in cost reports.

## B.   Entities and Fraudulent Conduct

### Excel Care Home Health Services, Inc.

38.   Excel is a Medicare-certified home health agency that provides nursing care, physical therapy, occupational therapy, speech therapy, and medical social services.  According to the United States Department of Health and Human Services' ("HHS's") online records, Excel was Medicare-certified on November 28, 2004, and its business address is 222 North Mountain Avenue, Suite 104, Upland, CA 91786.  According to the California Secretary of State's online records, Excel was incorporated on July 30, 2003, and its agent for service of process is Ms. Dove de Jesus.

39.   Excel's staff of nurses, physical therapists, occupational therapists, speech therapists, and medical social workers visit patients at their homes and provide care under a doctor-certified plan of care.  Medicare pays for the home health services that

BROWN, WHITE & NEWHOUSE<sup>LLP</sup>
ATTORNEYS

1    Excel provides.  Excel relies predominantly on Medicare for its income.

2              *a.  Excel Offered and Gave Illegal Remuneration in Violation of the Anti-*

3                  *Kickback Statute*

4         40.    During the 2008 to 2010 time period, based on information that Mr. Timple

5    obtained from working with Excel's records and on Excel's premises in the course of his

6    duties at Emerald, Mr. Timple observed that Excel gave kickbacks to doctors and

7    marketers for referring patients to Excel in violation of the Anti-Kickback Statute.  *See*

8    42 U.S.C. § 1320a-7b(b).

9         41.    Excel gave kickbacks for patient referrals to at least three marketers who

10   referred patients from doctors, a care facility, and a senior living community.  Excel

11   concealed the payment of kickbacks using methods including faxing check requests to

12   Emerald to make checks payable to individual marketers, and/or paying marketers as

13   independent contractors directly from Excel's accounts.

14        42.    The culture of kickbacks at Excel was exemplified by how the marketers

15   communicated with Excel.  In one instance, a licensed vocational nurse ("LVN") and

16   case manager at a hospital who referred patients to Excel, called Excel's owner, Dove de

17   Jesus, on Dove de Jesus' cell phone to alert her to a patient who was being discharged

18   the next day to be serviced by Excel.

19        43.    Mr. Timple also alleges that Excel's marketers shared the kickbacks they

20   received from Excel with the patients' doctors.  For instance, one marketer used the

21   kickbacks he received from Excel to buy lunches for doctors' offices.

22        44.    Providing kickbacks to doctors is illegal because it creates a conflict of

23   interest for the doctor between appropriate patient care and remuneration to the doctor.

24   On at least one occasion, a case manager from Excel called a doctor who was connected

25   to a marketer, about a patient recertification.  Mr. Timple overheard this call.

26        45.    A patient must be recertified for home health care every sixty days.  In one

27   instance, a particular patient was last recertified because of high blood pressure, but

28   Excel employee named "Beck" noticed in the patient's chart that the patient's blood

BROWN, WHITE & NEWHOUSE""
ATTORNEYS

1106259.1

1    pressure had returned to normal.  (A "patient chart" is a collection of documents that

2    make up an individual patient's file.  It contains a "visit calendar," which shows the

3    scheduled and actual visits to the patient by each specialty; "patient notes," which are

4    handwritten and/or typed notes detailing each visit to the patient, and other documents.)

5    Mr. Timple heard Beck say aloud, in Tagalog (Mr. Timple is fluent), that the patient had

6    been recertified so many times that Beck could not determine what the patient was being

7    treated for anymore.  When Beck called the physician to ask whether the patient should

8    be recertified and, if so, what the diagnosis should be, the physician instructed her to

9    recertify the patient using whatever diagnosis Beck wanted to list.

10       46.    On information and belief, Mr. Timple alleges that Excel paid

11   approximately $64,800 in illegal kickbacks for patient referrals.

12       ***b. Excel Knowingly Submitted False and/or Fraudulent Claims for***
13       ***Payment to the Government and Made and Used False Records to Get***
14       ***False and/or Fraudulent Claims Paid by the Government***

15       47.    Based on information that Mr. Timple obtained from working with Excel's

16   records and on Excel's premises, Mr. Timple alleges that Excel knowingly submitted

17   false and/or fraudulent claims for payment to the Federal Government in violation of the

18   False Claims Act.  *See* 31 U.S.C. § 3729(a)(1).  Mr. Timple also alleges that Excel

19   knowingly made and used false records to get false and/or fraudulent claims paid by the

20   Government in violation of the False Claims Act.  *See* 31 U.S.C. § 3729(a)(2).

21       48.    In most cases, one or more persons performed acts in a conspiracy to get

22   false or fraudulent claims allowed or paid by the United States.  *See* 31 U.S.C.

23   3729(a)(3).  In all cases where false and/or fraudulent claims were submitted to the

24   Government, or false records were made to get false and/or fraudulent claims paid,

25   Excel also breached its continuing duty to comply with Medicare regulations to repay

26   funds received for those false and/or fraudulent claims.  *See* 31 U.S.C. § 3729(a)(7).

27       49.    During the years 2008 to 2010, Excel engaged in conduct, including but not

28   limited to, the following in order to knowingly submit false and/or fraudulent claims,

1106259.1

BROWN, WHITE & NEWHOUSE"
ATTORNEYS

1   and knowingly make false records to get false and/or fraudulent claims paid and/or

2   approved:

3       i.    Excel billed Medicare for final payment for services for which it did not

4           have a signed MD order.  Mr. Timple has evidence that, on at least thirty-

5           one separate occasions, Excel billed Medicare for final payment for services

6           without a signed MD order.  (Such as, orders for patients

7           VA, AC, ED, GD, CD, MD, CE, SG, MG, YH, GH, PG, MG, YH, PH, SH,

8           GH, SH, NK, LL, EL, KL, JM, EN, LP, PR, VS, MS, AT, AC, CD, and

9           SG.)  This is an example of how Excel knowingly submitted false claims

10          for payment to the Government in violation of 31 U.S.C. § 3729(a)(1).

11          Since any person who knowingly submits or causes to be submitted to the

12          United States for payment or approval a false or fraudulent claim is liable to

13          the Government for a civil penalty of not less than $5,500 and not more

14          than $11,000 for each claim, plus three times the amount of damages

15          sustained by the Government because of the false or fraudulent claim, these

16          thirty-one occurrences cause Excel to be liable for a civil penalty between

17          $170,500 and $341,000, plus three times the amount of actual damages

18          sustained by the Government.

19      ii.    Excel also forged doctors' signatures on MD orders prior to submitting a

20          final claim for payment to Medicare.  Mr. Timple witnessed at least two

21          forged doctor signatures on MD orders for which he was told to send the

22          final claim to Medicare.  (Patients FK, BS, and AP.)  This is an example of

23          how Excel made false records to get fraudulent claims paid by the

24          Government in violation of 31 U.S.C. § 3729(a)(2).  Since any person who

25          knowingly submits or causes to be submitted to the United States for

26          payment or approval a false or fraudulent claim is liable to the Government

27          for a civil penalty of not less than $5,500 and not more than $11,000 for

28          each claim, plus three times the amount of damages sustained by the

BROWN, WHITE & NEWHOUSE"
ATTORNEYS

1106259.1

1   Government because of the false or fraudulent claim, these two occurrences

2   cause Excel to be liable for a civil penalty between $11,000 and $22,000,

3   plus three times the amount of actual damages sustained by the

4   Government.

5   iii.   Excel obtained MD orders from doctors who were not qualified to prescribe

6   care for HHA patients.  On at least one occasion, Mr. Timple was present

7   when a marketer referred a patient to Excel and told Excel to contact a

8   specific doctor for the MD order.  (Patient BS.)  Excel's case manager

9   determined that this doctor was a cosmetic surgeon and not qualified to give

10   a home healthcare order.  The case manager called another doctor, who

11   determined that the patient did not qualify for home health care.  When the

12   case manager called the marketer back to tell him that the patient did not

13   qualify, the marketer told the case manager that he would obtain the MD

14   order for the patient himself and provide it to Excel.  This is an example of

15   how Excel made false records to get fraudulent claims paid by the

16   Government in violation of 31 U.S.C. § 3729(a)(2).  Since any person who

17   knowingly submits or causes to be submitted to the United States for

18   payment or approval a false or fraudulent claim is liable to the Government

19   for a civil penalty of not less than $5,500 and not more than $11,000 for

20   each claim, plus three times the amount of damages sustained by the

21   Government because of the false or fraudulent claim, this one occurrence

22   causes Excel to be liable for a civil penalty between $5,500 and $11,000,

23   plus three times the amount of actual damages sustained by the

24   Government.

25   iv.   Excel frequently fabricated visit notes and placed them in patient charts

26   when specialists missed patient visits in order to make it appear that a visit

27   took place.  Mr. Timple has evidence that this occurred on at least two

28   occasions.  (Patients RA and RW.)  This is an example of how Excel made

BROWN, WHITE & NEWHOUSE<sup>LLP</sup>
ATTORNEYS

1106259.1

1   false records to get fraudulent claims paid by the Government in violation

2   of 31 U.S.C. § 3729(a)(2).  Since any person who knowingly submits or

3   causes to be submitted to the United States for payment or approval a false

4   or fraudulent claim is liable to the Government for a civil penalty of not less

5   than $5,500 and not more than $11,000 for each claim, plus three times the

6   amount of damages sustained by the Government because of the false or

7   fraudulent claim, these two occurrences cause Excel to be liable for a civil

8   penalty between $11,000 and $22,000, plus three times the amount of actual

9   damages sustained by the Government.

10   v.    In addition to fabricating patient notes, Excel also falsified visit calendars to

11         show that scheduled visits took place when they did not.  Mr. Timple has

12         evidence that the falsification of visit calendars occurred at least six times.

13         (Patient JL.)  This is an example of how Excel made false records to get

14         fraudulent claims paid by the Government in violation of 31 U.S.C. §

15         3729(a)(2).  Since any person who knowingly submits or causes to be

16         submitted to the United States for payment or approval a false or fraudulent

17         claim is liable to the Government for a civil penalty of not less than $5,500

18         and not more than $11,000 for each claim, plus three times the amount of

19         damages sustained by the Government because of the false or fraudulent

20         claim, these six occurrences cause Excel to be liable for a civil penalty

21         between $33,000 and $66,000, plus three times the amount of actual

22         damages sustained by the Government.

23   vi.   Excel's patient notes frequently showed specialists visiting more than one

24         patient in different locations at the same time, which is a physical

25         impossibility.  This could occur if a specialist inflated the time they spent

26         with one patient, thereby overlapping with the start time of the next

27         appointment, or if Excel created patient notes for a visit which did not occur

28         but overlapped with an actual visit by the same specialist to a different

BROWN, WHITE & NEWHOUSE^LLP
ATTORNEYS

17
QUI TAM COMPLAINT

patient at the same time.  Mr. Timple has evidence that this occurred on at least sixty-five different occasions.  (Including patients TY, AB, LM, PH, VD, RO, FS, HH, GA, JB, TK, NG, MM, MB, FM, EP, GL, MH, SA, SS, TD, MS, BN, NS, CM, MP, BD, JL, YF, MK, AD, JD, DD, SS, JD, JB, RB, MP, FC, and HF.)  This is an example of how Excel knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).  Since any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim, these sixty-five occurrences cause Excel to be liable for a civil penalty between $357,500 and $715,000, plus three times the amount of actual damages sustained by the Government.

vii.   At times, multiple specialists from different specialties would visit the same patient at the same time.  This is not permitted.  Mr. Timple has evidence that, on at least thirty-nine separate occasions, multiple Excel specialists visited the same patient at the same time.  (Including patients SS, KD, KB, RB, MP, FC, HF, FS, JH, SV, NK, AP, RP, AF, EL, SV, JD, LM, NO, AM, FR, TD, FP, and JM.)  This is an example of how Excel knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1).  Since any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent

18

1106259.1

claim, these thirty-nine occurrences cause Excel to be liable for a civil penalty between $214,500 and $429,000, plus three times the amount of actual damages sustained by the Government.

viii. Excel's patient charts frequently lacked patient notes for scheduled visits, which would happen if the scheduled visits did not take place. Mr. Timple has evidence which shows that, for at least one patient, historical visit notes were fabricated long after the scheduled visits in order to make it appear that the visits took place. (For example, patients AS and MG.) This is an example of how Excel made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2). Since any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim, this one occurrence causes Excel to be liable for a civil penalty between $5,500 and $11,000, plus three times the amount of actual damages sustained by the Government.

ix. Excel fabricated patient notes to falsely allege that its specialists gave proper warnings regarding care to patients when those warnings were never expressed. Mr. Timple has evidence that, on at least one occasion, the handwritten patient notes turned in by a specialist did not include any warnings given, but the typewritten notes created by one of Excel's supervisors included warnings and instructions. (Patient JR.) This is an example of how Excel made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2). Since any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government

19

1106259.1

1    for a civil penalty of not less than $5,500 and not more than $11,000 for

2    each claim, plus three times the amount of damages sustained by the

3    Government because of the false or fraudulent claim, this one occurrence

4    causes Excel to be liable for a civil penalty between $5,500 and $11,000,

5    plus three times the amount of actual damages sustained by the

6    Government.

7    x.   When Excel received ADR requests from Medicare for additional patient

8    documents, including all patient notes, billing, and MD orders, Excel

9    assigned a QA to examine the patient charts to determine any deficiencies

10   and recommend corrective action before sending the documents to

11   Medicare. The QA's examination was reported on charts called "QA/QI

12   Nursing Notes," with columns for "Problems Identified" and "Action Taken

13   & Outcome." Mr. Timple has evidence that, in response to one ADR from

14   Medicare which requested additional documents concerning forty-one

15   patients, Excel fabricated or altered 187 documents in order to qualify for

16   reimbursement. This is an example of how Excel made false records to get

17   fraudulent claims paid by the Government in violation of 31 U.S.C. §

18   3729(a)(2). Since any person who knowingly submits or causes to be

19   submitted to the United States for payment or approval a false or fraudulent

20   claim is liable to the Government for a civil penalty of not less than $5,500

21   and not more than $11,000 for each claim, plus three times the amount of

22   damages sustained by the Government because of the false or fraudulent

23   claim, these 187 occurrences cause Excel to be liable for a civil penalty

24   between $1,028,500 and $2,057,000, plus three times the amount of actual

25   damages sustained by the Government.

26   xi.  Excel billed Medicare for services to patients who were not homebound.

27   On at least two occasions, Mr. Timple overheard a specialists talking about

28   patients who were not homebound. (Patients VR and GT.) This is an

20

1106259.1

BROWN, WHITE & NEWHOUSE"
ATTORNEYS

1    example of how Excel made false records to get fraudulent claims paid by

2    the Government in violation of 31 U.S.C. § 3729(a)(2).  Since any person

3    who knowingly submits or causes to be submitted to the United States for

4    payment or approval a false or fraudulent claim is liable to the Government

5    for a civil penalty of not less than $5,500 and not more than $11,000 for

6    each claim, plus three times the amount of damages sustained by the

7    Government because of the false or fraudulent claim, these two occurrences

8    cause Excel to be liable for a civil penalty between $11,000 and $22,000,

9    plus three times the amount of actual damages sustained by the

10    Government.

11    xii.    Mr. Timple observed in the course of his work that Excel also billed

12    Medicare for patients who refused care or did not need care.  Medicare does

13    not pay HHAs for services if the patient, family member, or other person is

14    or will be providing services that adequately meet the patient's needs,

15    because it is not reasonable and necessary for HHA personnel to furnish

16    such services: "Ordinarily it can be presumed that there is no able and

17    willing person in the home to provide the services being rendered by the

18    HHA unless the patient or family indicates otherwise and objects to the

19    provision of the services by the HHA, or unless the HHA has first hand

20    knowledge to the contrary." Medicare Benefit Policy Manual, Chapter 7, §

21    20.2.  Excel, however, provided such unnecessary services to at least six

22    diabetic patients.  (Such as patients RP, AP, MG, BS, EP, and CE.)  This is

23    an example of how Excel knowingly submitted fraudulent claims to the

24    Government in violation of 31 U.S.C. § 3729(a)(1), and made false records

25    to get fraudulent claims paid by the Government in violation of 31 U.S.C. §

26    3729(a)(2).  Since any person who knowingly submits or causes to be

27    submitted to the United States for payment or approval a false or fraudulent

28    claim is liable to the Government for a civil penalty of not less than $5,500

QUI TAM COMPLAINT

BROWN, WHITE & NEWHOUSE<sup>LLP</sup>
ATTORNEYS

and not more than $11,000 for each claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim, these six occurrences cause Excel to be liable for a civil penalty between $33,000 and $66,000, plus three times the amount of actual damages sustained by the Government.

xiii.   Mr. Timple observed that for at least one patient, the patient refused to be seen but Excel continued visiting her and billing Medicare for the visits. (Patient MG.)  This is an example of how Excel knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1). Since any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim, this one occurrence causes Excel to be liable for a civil penalty between $5,500 and $11,000, plus three times the amount of actual damages sustained by the Government.

xiv.   Mr. Timple observed that for at least one patient, the patient refused further care because the patient's wound had healed.  (Patient MG.)  However, Excel had already recertified the patient for five more visits.  Therefore, Excel told the nurse to do at least five more visits before discontinuing service.  Continually recertifying patients is one way HHAs make money, even when there is no medical necessity.  Also, since anything less than five visits in a plan of care requires the provider to wait to bill Medicare until after each visit rather than getting an up-front payment for a plan of care with five or more visits, Excel enforced the recertified plan for all five visits.  (Billing per visit is called a "low utilization payment adjustment" or "LUPA.")  This is an example of how Excel knowingly submitted

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

1106259.1

fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1).
Since any person who knowingly submits or causes to be submitted to the
United States for payment or approval a false or fraudulent claim is liable to
the Government for a civil penalty of not less than $5,500 and not more
than $11,000 for each claim, plus three times the amount of damages
sustained by the Government because of the false or fraudulent claim, these
five occurrences cause Excel to be liable for a civil penalty between
$27,500 and $55,000, plus three times the amount of actual damages
sustained by the Government.

### c. *Excel Altered Its Records to Conceal Its Substandard Patient Care*

50.     Mr. Timple has evidence that during the years 2008 to 2010, Excel
fabricated notes in patient charts, including false MD orders, in order to cover up its
mistakes regarding patient care.  Mr. Timple observed the following:

i.      Excel removed an MD order from a patient's chart after Excel realized that
the order prescribed visits by an occupational therapist as part of the
patient's plan of care, but no such visits ever occurred.  (Patient RH.)

ii.     Excel fabricated an MD order after a physical therapist missed a patient
visit, and placed it in the patient chart.  The fabricated order erroneously
stated that the patient had put a "hold" on visits by the physical therapist for
that week.   (Patient WY.)

iii.    Excel fabricated an MD order to state that physical therapy was
discontinued for a patient when it had not been.  The order was fabricated to
explain missed visits.  (Patient RP.)

iv.     Excel took notes out of patient charts which showed "out-of-frequency"
visits, or visits which occurred more often than prescribed in the patients'
plan of care.  (Patient MB.)

v.      In at least one instance, Excel did not follow the plan of care for a patient.
(Patient MG.)

1106259.1

BROWN, WHITE & NEWHOUSE
ATTORNEYS

vi.     Excel billed Medicare for at least twelve specialist visits to patients whose plans of care did not include visits by that specialty.  (Patient RP.)

**Insight Health Care Providers, Inc.**

51.     Insight is a home health agency that provides in-home skilled and custodial care.  According to HHS's online records, Insight is not Medicare-certified.  According to the California Secretary of State's online records, Insight was incorporated on July 15, 2003, its business address is 500 South Kraemer Blvd., Suite 240, Brea, CA 92821, and its agent for service of process is Roderick Aquino.  Insight is owned by Roderick Aquino, but he engages in profit sharing with Lerma Estudillo and Arlene Fajardo.

### a.   *Insight Offered and Gave Illegal Remuneration in Violation of the Anti-Kickback Statute*

52.     Based on information that Mr. Timple obtained from working with Insight's records and on Insight's premises as part of his duties with Emerald, Insight gave kickbacks to marketers for referring patients to Insight in violation of the Anti-Kickback Statute.

53.     On information and belief, Mr. Timple alleges that Insight paid approximately $121,600 in illegal kickbacks for patient referrals.

**Lemar Home Health Services, Inc.**

54.     Lemar is a Medicare-certified home health agency that provides nursing care, physical therapy, occupational therapy, speech therapy, medical social services, and home health aides.  According to HHS's online records, Lemar was Medicare-certified on April 3, 2003, and its business address is 750 Terrado Plaza, Suite 31, Covina, CA 91723.  According to the California Secretary of State's online records, Lemar was incorporated on April 5, 2002, and its agent for service of process is Lerma Estudillo.

55.     Lemar's staff of nurses, physical therapists, occupational therapists, speech therapists, and medical social workers visit patients at their homes and provide care

BROWN, WHITE & NEWHOUSE"
A T T O R N E Y S

1   under a doctor-certified plan of care.  Medicare pays for the home health services that

2   Lemar provides.  Lemar relies exclusively on Medicare for its income.

3       56.   Based on information that Mr. Timple obtained from working with Lemar's

4   records and on Lemar's premises in the course of his duties with Emerald, Mr. Timple

5   also alleges that Lemar owned another HHA, St. Luke Home Health Care, Inc. ("St.

6   Luke"), based in San Gabriel, CA.  Upon information and belief, Mr. Timple alleges that

7   Lemar financed St. Luke in order to conceal the actual size of Lemar's revenue and

8   client base.

9       *a.   Lemar Offered and Gave Illegal Remuneration in Violation of the Anti-*

10         *Kickback Statute*

11       57.   Based on information that Mr. Timple obtained from working with Lemar's

12   records and on Lemar's premises, Lemar gave kickbacks to doctors and marketers for

13   referring patients to Lemar in violation of the Anti-Kickback Statute.  *See* 42 U.S.C. §

14   1320a-7b(b).  For example, one particular doctor referred sixty-nine patients to Lemar

15   and received kickbacks for each of these referrals.  (Patients including EC, CF, SF, JH,

16   RJ, GJ, WM, FM, CR, MR, VS, SS, RT, OV, RV, DN, GB, MC, JA, RA, LB, SB, CB,

17   AB, RC, FC, SC, PC, PD, JD, JE, MF, NG, MG, MG, JH, CH, JL, JL, EL, MM, GM,

18   WM, WM, CM, JM, AM, MM, MM, JN, RO, NR, CR, LR, BR, JS, ES, JS, GS, DS, RT,

19   MW, GV, and RZ.)

20       58.   On information and belief, Mr. Timple alleges that Lemar gave kickbacks

21   for patient referrals to at least nine marketers.  For example, one marketer referred 57

22   patients to Lemar. (Patients including CU, RA, BF, NJ, SM, SU, CA, MM, AS, EZ, JM,

23   HS, JM, WM, ZV, LP, AK, CC, ES, ST, TT, PN, SK, BM, WS, BW, PL, AJ, RL, MP,

24   AM, and JW.)  Another marketer referred 49 patients to Lemar.  (Patients including HA,

25   NA, MH, RD, CF, and NG.)  These individuals received remuneration from Lemar for

26   referring patients to Lemar.

27       59.   On information and belief, Mr. Timple also alleges that doctors received

28   illegal kickbacks from Lemar through its marketers.  Instead of referring patients

1106259.1

BROWN, WHITE & NEWHOUSE^LLP
ATTORNEYS

1 directly to Lemar, doctors frequently faxed patient referrals to Lemar's marketers in
2 order to receive kickbacks from the marketer.

3     60.    Lemar concealed its payment of kickbacks in numerous ways.  One method
4 involved deleting records of payment from Lemar's and Emerald's systems after the
5 payments were made.

6     61.    Mr. Timple also alleges that Lemar's account records show multiple checks
7 issued to the same payee on the same day, at least some of which were cashed and
8 returned to Lemar to pay kickbacks in cash.  Mr. Timple obtained evidence which shows
9 that Lemar issues at least 100 of these multiple checks to the same individual, which Mr.
10 Timple contends were cashed and returned to Lemar to pay kickbacks in cash.

11     62.    In other cases, Lemar concealed kickbacks by making payments to shell
12 companies to look like vendor payments which were, in fact, directed to marketers.

13     63.    On information and belief, Mr. Timple alleges that Lemar paid
14 approximately $245,000 in illegal kickbacks for patient referrals.

15        ***b. Lemar Knowingly Submitted False and/or Fraudulent Claims for***
16          ***Payment to the Government and Made and Used False Records to Get***
17          ***False and/or Fraudulent Claims Paid by the Government***

18     64.    Based on information that Mr. Timple obtained from working with Lemar's
19 records and on Lemar's premises as part of his duties with Emerald during the years
20 2008 through 2010, Lemar knowingly submitted false and/or fraudulent claims for
21 payment to the Federal Government in violation of the False Claims Act.  *See* 31 U.S.C.
22 § 3729(a)(1).  Mr. Timple also alleges that Lemar knowingly made and used false
23 records to get false and/or fraudulent claims paid by the Government in violation of the
24 False Claims Act.  *See* 31 U.S.C. § 3729(a)(2).

25     65.    Mr. Timple also alleges that one or more persons affiliated with Lemar
26 performed acts in conspiracy to get false and/or fraudulent claims allowed or paid by the
27 United States.  *See* 31 U.S.C. § 3729(a)(3).  In all cases where false and/or fraudulent
28 claims were submitted to the Government, or false records were made to get false and/or

BROWN, WHITE & NEWHOUSE ᴸᴸᴾ
A T T O R N E Y S

1106259.1

1   fraudulent claims paid, Lemar also breached its continuing duty to comply with

2   Medicare regulations to repay funds received for those false and/or fraudulent claims.

3   *See* 31 U.S.C. § 3729(a)(7).

4          66.    On information and belief, Mr. Timple alleges that Lemar engaged in the

5   following conduct in violation of the False Claims Act:

6          i.     Lemar forged doctor signatures on MD orders which were not signed when

7                 Lemar billed Medicare for final payment for services.  (Including patients

8                 MF, ES, AA, MC, DH, KL, RB, and JA.)  This is an example of how

9                 Lemar made false records to get fraudulent claims paid by the Government

10                in violation of 31 U.S.C. § 3729(a)(2).

11         ii.    Lemar billed Medicare for patient visits which did not occur.  Mr. Timple

12                obtained evidence which shows that Lemar made false records showing

13                visits to patients that did not occur.  (Patient AE.)  This is an example of

14                how Lemar knowingly submitted fraudulent claims to the Government in

15                violation of 31 U.S.C. § 3729(a)(1), and made false records to get

16                fraudulent claims paid by the Government in violation of 31 U.S.C. §

17                3729(a)(2).

18         iii.   Lemar billed Medicare for patient visits for which it was not permitted to

19                seek payment from the Government.  Medicare does not pay for services

20                imposed by an immediate relative of the beneficiary, including parents or

21                children. 42 C.F.R. § 411.12.  Mr. Timple obtained evidence that Lemar's

22                nurse made patient visits to her mother on at least three occasions and billed

23                Medicare for those visits.  (Patient XT.)  This is an example of Lemar

24                knowingly submitting fraudulent claims to the Government in violation of

25                31 U.S.C. § 3729(a)(1).

26         iv.    Mr. Timple also obtained evidence which shows that Lemar billed

27                Medicare for patient visits which could not have taken place.  On at least

28                five days, one of Lemar's registered nurses reported visiting ten or more

1106259.1

BROWN, WHITE & NEWHOUSE
ATTORNEYS

1   patients each day, with as little as five minutes in between visits.  (Including

2   AW and HL.)  Lemar's records also show that two of this nurse's visits to

3   two different patients took place at exactly the same time.  This is an

4   example of how Lemar knowingly submitted fraudulent claims to the

5   Government in violation of 31 U.S.C. § 3729(a)(1), and made false records

6   to get fraudulent claims paid by the Government in violation of 31 U.S.C. §

7   3729(a)(2).

8   v.   On at least one occasion, Lemar recertified patients who did not need

9   continued care in order to provide additional patient visits and bill Medicare

10   for additional revenue.  (Patient AO.)  This is an example of how Lemar

11   knowingly submitted fraudulent claims to the Government in violation of

12   31 U.S.C. § 3729(a)(1), and more than one person performed acts in a

13   conspiracy to get a false claim allowed or paid by the United States.

14   Lemar's patient notes showed a specialist visiting more than one patient in

15   different locations at the same time, which is a physical impossibility.  This

16   could occur if a specialist inflated the time they spent with one patient,

17   thereby overlapping with the start time of the next appointment, or if Lemar

18   created patient notes for a visit which did not occur but overlapped with an

19   actual visit by the same specialist to a different patient at the same time.

20   Mr. Timple has evidence that such overlapping visits occurred at least 214

21   times.  (Including patients FB, DS, GJ, LR, JR, WM, RM, LR, JB, MW,

22   DK, MG, RM, RV, EG, DM, EB, TW, AD, MP, AG, RW, CT, JC, NC, PV,

23   SC, MS, AM, BS, JL, CC, SB, DS, WM, ST, VA, RA, DW, RC, FB, RB,

24   GT, ED, MT, JT, AP, LL, GC, JV, FS, JQ, PN, JB, HA, PH, AB, CN, HP,

25   SR, BD, MF, JG, JQ, CS, FW, DH, LC, SH, LH, MH, MO, EA, CV, SW,

26   MG, SS, HS, HD, HC, HW, LL, JA, VC, CL, SS, SC, LM, JB, MT, DN,

27   CM, FW, AP, CV, EL, CV, AJ, G, MM, AP, AP, EB, BD, AS, JJ, AV, OS,

28   SM, RA, IB, DC, GM, AW, MM, VA, and ME.)  Lemar's clerks would

BROWN, WHITE & NEWHOUSE"
ATTORNEYS

28

1106259.1

change these discrepancies in Lemar's system to conceal the overlaps. On at least one occasion, Lemar generated a new patient note with new visit times to cover up the overlapping visit, but the new patient note had inaccurate information about the patient's vital signs, thereby putting the patient's health at risk in its effort to conceal wrongdoing. (Including patient AW.) This is an example of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

vi.   Lemar billed Medicare for visits by multiple specialists from different specialties to the same patient at the same time. This is not permitted. Mr. Timple has evidence that, on at least 105 separate occasions, multiple Lemar specialists visited the same patient at the same time. (Including patients HS, HD, AG, HC, HW, LL, JA, VC, CL, SS, SC, LM, JB, MT, DN, CM, FW, AP, CV, EL, CV, DC, GM, AA, PP, EL, RC, and JG.) This is an example of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1).

vii.  On at least six occasions, Lemar billed Medicare for patient visits while patients were hospitalized. (Including patients MB, RF, LV.) Mr. Timple obtained evidence which shows that Lemar billed for six visits to patients when the patients were, in fact, hospitalized. This is an example of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

viii. On at least seven occasions, Lemar fabricated MD orders in order to justify billing for visits to patients in excess of the number of visits prescribed in the plan of care. (Including patients XT, AW, SS, ZR, JL, RL, LV, VN,

1106259.1

AS, VZD, CC, VC, JW.)  These fabricated MD orders had forged doctor's signatures.  Instead of not billing Medicare for the excess visits, Lemar fabricated MD orders and billed Medicare.  These are examples of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

ix.    On at least eleven occasions, Lemar billed Medicare for patients who were not homebound.  (Patient ET.)  This is an example of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1).

x.    Lemar fabricated patient notes in order to support its claims for reimbursement when no notes were ever entered in the file by the specialist.  If there are no patient notes for a visit, it suggests that the visit never took place.  Mr. Timple obtained evidence which shows that Lemar fabricated patient visit notes for at least thirty-eight patient visits.  (Including patients SS and ZR.)  hese are examples of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

xi.    Lemar also falsified patient notes by changing dates to explain out-of-frequency visits.  Out-of-frequency visits are specialist visits which do not conform to the plan of care.  This occurred on at least three occasions.  (Including patients AS, JL, MM.)  These are examples of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

1106259.1

xii.   In addition to fabricating patient notes to support claims to Medicare, Lemar also fabricated team conference notes and 30-day progress notes when they were not in the patient chart as required.  (Exhibit patient ID.)

xiii.   Lemar billed Medicare for visits after the patient had refused further care or been discharged.  Mr. Timple obtained evidence that this occurred at least three times.  (Including patients FS and FL.)  These are examples of how Lemar knowingly submitted fraudulent claims to the Government in violation of 31 U.S.C. § 3729(a)(1), and made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

xiv.   When Lemar received ADR requests from Medicare for additional patient documents, including all patient notes, billing, and orders, Lemar would assign a QA to examine the patient charts to determine any deficiencies and recommend corrective action before sending the documents to Medicare. Lemar's QA person would come at night to review the patient charts.  The QA would either make notations with sticky notes on the patient notes to show how the documents needed to be altered before submission to Medicare, or submit a written "Chart Update" with suggestions.  Mr. Timple obtained evidence that, in response to one ADR from Medicare which requested additional documents for thirty-nine patients, Lemar fabricated new documents and MD orders, and altered existing documents in order to qualify for reimbursement.  (Including patients MF, MS, RR, FD, JN, LA, CZ, JS, GS, EM, JH, MF, BF, LC, JM, JL, NR, AG, RF, DG, CM, MV, CP, AC, MP, GG, RF, MM, AP, AP, CV, VC, EB, ML, BS, PK, BC, VA, and AA.)  Additionally, on at least thirteen occasions, Lemar fabricated MD orders prior to submitting the requested patient charts to Medicare in order justify treatment delivered.  (Including patients LA, CZ, JN, MS, RR, MF, NR, FD, LC, BF, JH, EM, GS, and JS.)  These are

QUI TAM COMPLAINT

1106259.1

1
2

examples of how Lemar made false records to get fraudulent claims paid by the Government in violation of 31 U.S.C. § 3729(a)(2).

3   67.   Any person who knowingly submits or causes to be submitted to the United

4 States for payment or approval, a false or fraudulent claim is liable to the Government

5 for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus

6 three times the amount of damages sustained by the Government because of the false or

7 fraudulent claim.  The events Mr. Timple alleges herein cause Lemar to be liable for a

8 civil penalty between $2,260,500 and $4,521,000, plus three times the amount of actual

9 damages sustained by the Government.

10   ### c. Lemar Altered Its Records to Conceal Substandard Care to Its Patients

11   68.   Mr. Timple has evidence that Lemar fabricated and destroyed patient notes

12 to cover up its mistakes regarding patient care.  Whether or not the falsified records were

13 submitted to the government, these occurrences are consistent with an entity which was

14 more concerned about billing for services than providing appropriate patient care.  For

15 example:

16   i.   Lemar removed MD orders from patient charts after discovering that the

17       MD order was not followed.  (Patient DN.)

18   ii.   Lemar removed patient notes from a patient visit by a licensed vocational

19       nurse ("LVN") after Lemar realized later that, because the patient was

20       within the five-day window for recertification, the patient should have been

21       visited by a registered nurse rather than an LVN.  (Patient AG.)

22   iii.   Lemar removed skilled nurse visit notes from a patient chart after realizing

23       that the skilled nurse visited the patient out of frequency with the plan of

24       care.   (Patient AW.)

25   iv.   Lemar failed to have a skilled nurse visit a patient for four weeks after the

26       initial skilled nurse's visit.  (Patient MG.)

27   v.   For one patient, Lemar fabricated an MD order to conceal a skilled nurse's

28       failure to visit a patient according to a plan of care.  Similar fabrications

32

1106259.1

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

1      occurred with four additional patients who were not visited for multiple

2      weeks prior to discharge.  (Patients AH, MP, LH, HH, and HC.)

3      vi.    For another patient, Lemar fabricated an MD order when a patient was

4             given an evaluation by a physical therapist when there was no MD order on

5             file for the evaluation.   (Patient PN.)

6      vii.   For one patient, an MD order was forged to start the plan of care one week

7             later than it was prescribed to start because Lemar's skilled nurse failed to

8             visit the patient during the first week of the certification period.  Like all

9             fabricated MD orders, a doctor's signature was forged on this MD order.

10            (Patient AG.)

11     viii.  Lemar also fabricated missed visit notes when patient visits were missed.

12            (Patients DH, KL, RB, and JA.)

13     ix.    Lemar also compensated workers who were ineligible to work in the US by

14            paying family members of the workers.

15     **Rightcare Home Health Services, Inc.**

16            69.    Rightcare is a home health agency which provides nursing care, physical

17     therapy, occupational therapy, speech therapy, medical social services, and home health

18     aides.  According to HHS's online records, Rightcare is Medicare-certified.  According

19     to the California Secretary of State's online records, Rightcare was incorporated on June

20     3, 2002, its business address is 600 West Broadway, Suite 110, Glendale, CA 91204, and

21     its agent for service of process is Sonny Agonias.

22            *a.    Rightcare Knowingly Submitted False and/or Fraudulent Claims for*

23                   *Payment to the Government and Made and Used False Records to Get*

24                   *False and/or Fraudulent Claims Paid by the Government*

25            70.    Based on information that Mr. Timple obtained from working with

26     Rightcare's records and on Rightcare's premises in the course of his duties with

27     Emerald, Rightcare billed Medicare for providing insulin services to a diabetic patient

28     who was adept at handling his own insulin treatments, making these services

33

1106259.1

1   unnecessary.  This is the knowing submission of a fraudulent claim for payment to the

2   Federal Government in violation of 31 U.S.C. § 3729(a)(1), and a breach of Rightcare's

3   continuing duty to comply with regulations on which payment is conditioned in an effort

4   to avoid repaying to the Government the already-received funds in violation of 31

5   U.S.C. § 3729(a)(7).

6       71.   Since any person who knowingly submits or causes to be submitted to the

7   United States for payment or approval a false or fraudulent claim is liable to the

8   Government for a civil penalty of not less than $5,500 and not more than $11,000 for

9   each claim, plus three times the amount of damages sustained by the Government

10  because of the false or fraudulent claim, this occurrence causes Lemar to be liable for a

11  civil penalty between $5,500 and $11,000, plus three times the amount of actual

12  damages sustained by the Government.

13  **Serenity Health Care, Inc.**

14      72.   Serenity is a Medicare-certified home health agency that provides nursing

15  care, physical therapy, occupational therapy, speech therapy, medical social services,

16  and home health aide.  According to HHS's online records, Serenity was Medicare-

17  certified on March 18, 2005, and its business address is 1149 South Grand Avenue,

18  Glendora, CA 91740.  According to the California Secretary of State's online records,

19  Serenity was incorporated on April 2, 2002, its status is currently suspended, and its

20  agent for service of process is Helen Martin.  Based on information and belief, Mr.

21  Timple alleges that Helen Martin is the owner of Serenity, perhaps along with her

22  daughter.

23      73.   Serenity's staff of nurses, physical therapists, occupational therapists,

24  speech therapists, and medical social workers visit patients at their homes and provide

25  care under a doctor-certified plan of care.  Medicare pays for the home health services

26  that Serenity provides.

27          *a. Serenity Offered and Gave Illegal Remuneration in Violation of the*

28          *Anti-Kickback Statute*

1106259.1

BROWN, WHITE & NEWHOUSE<sup>LLP</sup>
ATTORNEYS

74. Based on information that Mr. Timple obtained from working with Serenity's records and on Serenity's premises in the course of his duties at Emerald, Serenity gave kickbacks to marketers for referring patients to Serenity in violation of the Anti-Kickback Statute.

75. Serenity gave kickbacks for patient referrals to at least two marketers. One marketer had referrals that came from Primary Care, a home health agency which was owned by Evelyn Prakash but lost its provider number. Mr. Timple obtained evidence which shows that that this marketer was paid $39,963 from Serenity for diabetic patients he referred to Serenity from Primary Care, a rate of $21 for each of the 1,903 hours that one of Serenity's licensed vocational nurses visited a referred patient. This marketer also billed Serenity for kickbacks by 1099; he submitted invoices from "Kristina's Consulting Services" with false descriptions for services allegedly performed, and Serenity paid those invoices.

76. Mr. Timple also obtained evidence which shows that Serenity shared its net profits with the former owner of Primary Care, who transferred Primary Care's patients to Serenity after Primary Care was closed down. This person received 40% of Serenity's net profits from patients referred from Primary Care after payment of expenses and the kickback to the physician. Serenity paid this nonprofit owner at least $31,292.64 in kickbacks for patient referrals.

77. On information and belief, Mr. Timple alleges that Serenity paid approximately $71,255 in illegal kickbacks for patient referrals.

**Unik Home Health Care Services, Inc.**

78. Unik Home Health Care Services, Inc. ("Unik") is a home health agency which provides in-home skilled and custodial care. According to HHS's online records, Unik is not Medicare-certified. According to the California Secretary of State's online records, Unik was incorporated on April 29, 2003, its business address is 126 South Jackson Street, Suite 203, Glendale, CA 91205, and its agent for service of process is Tigran Oganesyan.

1106259.1

### a. Unik Offered and Gave Illegal Remuneration in Violation of the Anti-Kickback Statute

79. Based on information that Mr. Timple obtained from working with Uniks's records and on Unik's premises in the course of his duties at Emerald, Unik gave kickbacks to marketers for referring patients to Unik in violation of the Anti-Kickback Statute. One of Unik's owners told Mr. Timple that Unik pays $800 per referral. This owner also told Mr. Timple that his daughter, Unik's President, coordinated payment of kickbacks.

80. On information and belief, Mr. Timple alleges that Unik paid at least $800 in illegal kickbacks for one patient referral. (Patient RM.)

## VI.   CLAIM

### A.   CLAIM I – FALSE CLAIMS (31 U.S.C. § 3729)

#### Against All Defendants

81. Mr. Timple realleges and hereby incorporates by reference each and every allegation contained in paragraphs 1 through 79 of this complaint. Based on the acts described above, Defendants knowingly committed each of the following unlawful acts:

    i. Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    ii. Defendants knowingly made, used, or caused to be or used, a false record or statement to get a false or fraudulent claim paid or approved by the U.S. Government; and

    iii. Defendants conspired to defraud the Government by getting a false or fraudulent claim allowed or paid.

82. Defendants violated 31 U.S.C. § 3729 by knowingly causing millions of dollars in false claims to be made, used and presented to the United States government from at least 2008 to 2010, by its violation of federal and state laws as described herein.

1106259.1

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

83.     The United States government, by and through the Medicare program and other federal health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims Defendants submitted, including in response to Defendants' Medicare Cost Reports submitted during the years 2008, 2009, and 2010.

84.     Full compliance with applicable Medicare and various other federal and state laws, was an implied condition of payment of claims submitted to the government in connection with Defendants' fraudulent and illegal practices.

85.     Had the United States Government known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

86.     As a result of Defendants' violations of 31 U.S.C. § 3729, the United States government has been damaged.

87.     There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Mr. Timple is an original source as defined therein.

88.     Due to Defendant's conduct described herein, the United States Government has suffered substantial monetary damages.

## **RELIEF**

89.     On behalf of the United States Government, Mr. Timple seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, Mr. Timple seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

90.     Mr. Timple seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(b) of the False Claims Act.

91.     Mr. Timple seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

//

1106259.1

92.  Mr. Timple seeks to be awarded all other relief on behalf of the United States Government to which either may be entitled and that the Court deems just and proper.

## **PRAYER**

WHEREFORE, Mr. Timple prays that this Court enter judgment on behalf of Mr. Timple and against Defendants for the following:

a.  Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

b.  Civil penalties against Defendants for up to $11,000 for each violation of 31 U.S.C. § 3729;

c.  Mr. Timple be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.  Mr. Timple be awarded all costs and expenses of this litigation, including attorneys' fees and costs of court;

e.  All other relief on behalf of Mr. Timple or the United States Government to which either may be entitled and that the Court deems just and proper.

DATED:  May 9, 2014                 Respectfully submitted,

BROWN WHITE & NEWHOUSE LLP

By

Kenneth P. White (Bar No.: 173993)
Nannina L. Angioni (Bar No.: 238052)
333 S. Hope St., 40th FL
Los Angeles, CA 90071
Telephone: (213) 613-0500
Facsimile: (213) 613-0550
***Attorneys for Relator Alex Timple***

1106259.1

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ALEX TIMPLE | EXCEL CARE HOME HEALTH SERVICES, INC., et al. |

**ORIGINAL**

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Kenneth P. White<br>BROWN WHITE & NEWHOUSE LLP, 333 S. Hope Street, 40th Floor<br>Los Angeles, CA 90071, (213) 613-0500 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No   ☑ **MONEY DEMANDED IN COMPLAINT:** $ in excess of $5,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
31 U.S.C. 3729-3732

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | Habeas Corpus | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt | Enforcement of Judgment | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| Organizations | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | Veterans) | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | Veteran's Benefits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 368 Asbestos Personal Injury Product | ☐ 444 Welfare | Property 21 USC 881 | SOCIAL SECURITY |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | Liability | ☐ 445 American with Disabilities - | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | REAL PROPERTY | Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 220 Foreclosure | Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 230 Rent Lease & Ejectment | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 240 Torts to Land | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal | ☐ 230 Rent Lease & Ejectment | ☐ 245 Tort Product Liability | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| Access to Justice | ☐ 240 Torts to Land | ☐ 290 All Other Real Property | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

**CV14-3613**

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
  ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
<u>Note: In land condemnation cases, use the location of the tract of land involved</u>

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Jann Muller_     Date ~~October 3, 2011~~ May 9, 2014

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |